DA 09-0065

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 364

KEITH A. CHRISTIE,

      Petitioner and Appellant,

    v.

DEPARTMENT OF ENVIRONMENTAL QUALITY,
STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV-2008-035
Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Peter Michael Meloy, Meloy Law Firm, Helena, Montana

      For Appellee:

         John F. Sullivan, Cherche Prezeau, Hughes, Kellner, Sullivan
& Alke, PLLP, Helena, Montana

Submitted on Briefs: September 30, 2009

Decided: November 3, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Keith Christie appeals from the order of the First Judicial District Court, Lewis and Clark County, affirming the Director of the Department of Environmental Quality's December 11, 2007 Findings of Fact, Conclusions of Law, Order, and Notice of Opportunity for Judicial Review, and denying Christie's petition for judicial review. We affirm.

## ISSUES

¶2 A restatement of the issues presented on appeal is:

¶3 Did the District Court and Director Opper err by substituting their judgment for that of the Hearing Examiner's as to the weight of the evidence?

¶4 Did the District Court err by referencing a warning letter that was not part of the administrative record?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Christie was hired as a staff attorney for the Department of Environmental Quality (DEQ) in the spring of 2002. He was employed as a staff attorney from May 2002 until August 2007. John North, Chief Legal Counsel for DEQ, was Christie's supervisor. Because Christie was paid by the hour as a staff attorney, accurate time records were required. North discussed with Christie the importance of keeping accurate time records on numerous occasions.

¶6 During Christie's employment, Christie occasionally struggled with time entry and failed to work forty-hour workweeks. North issued a warning letter in 2004. As a result, Christie was subject to additional time-reporting requirements. Christie was required to

2

keep a daily log that showed when he arrived at work, when he went on break, when he left for lunch, when he returned from lunch, and when he left for work at the end of the day. Christie submitted this log to North at the end of each pay period.

¶7 On March 26, 2007, North became concerned that Christie was not submitting accurate time records. On that day, another DEQ attorney needed help with a project and North decided that Christie should assist the attorney. However, when North looked for Christie, Christie could not be found in his office and his computer was turned off. North looked for Christie all day but could not find him. North obtained Christie's home address from DEQ, drove to Christie's apartment complex, and observed Christie's car parked at the complex. Computer records indicated that Christie logged off his computer at 10:14 a.m. and did not log back in that day.

¶8 As a result of Christie's unexplained absence on March 26, North began keeping track of Christie's time. North enlisted other DEQ attorneys and staff members to help him with his investigation. North monitored Christie's actual work hours between March 26 and May 14, 2007, and compared those hours with the time Christie reported having worked. North noted a number of discrepancies between the time Christie was observed at work and the time Christie reported having worked. North did not inform Christie that he was conducting an investigation.

¶9 North and Jim Madden, DEQ Deputy Chief Legal Counsel, met with Christie on May 16, 2007, to discuss Christie's absences during the seven weeks that North had monitored Christie's time. By monitoring Christie's computer usage, the time Christie was observed at work, and the time during which Christie's vehicle was observed at his

apartment and not at work, DEQ determined that during the seven weeks he was monitored, Christie claimed to have worked approximately twenty-three hours that he did not actually work. During the meeting, North discussed with Christie the seriousness of falsification of time records, and Christie indicated that he understood the serious nature of the situation. North also asked Christie to account for his whereabouts two days earlier between the hours of 10:00 a.m. and 3:00 p.m. Christie had been signed out to Public Water Supply. Christie explained that he had met with Gino Pizzini during that time. North checked with Pizzini, who stated that he had not met with Christie and that he had in fact been looking for Christie that day but could not find him.

¶10 North and Madden met with Christie again on June 1, 2007. At this meeting, after being informed that North had checked with Pizzini, Christie changed his accounting of his whereabouts on May 14. Christie claimed instead to have been home sick and acknowledged that he had not met with Pizzini. North gave Christie a memo detailing the discrepancies between Christie's time records and observations of Christie's absences from work. North asked that Christie provide a response by June 5, 2007.

¶11 Christie provided his response on June 4, 2007, and suggested that some of his absences from work might have been due to Christie's working in other buildings, conducting research at the law library, or walking to and from work. North reviewed Christie's responses and did not find them credible. Significantly, Christie had previously stated that he drove to work, and North and Madden had observed Christie's car at his apartment on numerous occasions that he claimed to have been working at

4

DEQ. North subsequently made a recommendation of termination to Richard Opper, Director of DEQ.

¶12 Director Opper scheduled a pretermination meeting after receiving North's recommendation and notified Christie so that he could provide a response to North's recommendation for termination. In response, Christie stated that he had already addressed North's findings in the response he provided on June 4, 2007, and that he had nothing more to add. On August 13, 2007, DEQ notified Christie of his discharge from employment. In his termination letter to Christie, Director Opper stated: "You were told by your supervisor that false reporting of time is not to occur because it violates the public trust. It is a manifestation of dishonesty and it is a theft of state resources."

¶13 Christie subsequently grieved his termination. Pursuant to the grievance procedures, a hearing was conducted before Hearing Examiner John Melcher. During the grievance hearing, Christie argued that DEQ had violated its personnel policies by taking into consideration the warning letter issued to him in February 2004 by North regarding keeping accurate time records. According to the terms of the letter, it should have been removed from his personnel file in August 2005, but DEQ failed to remove it. Christie also maintained that DEQ had violated its internal policies by failing to account for the lack of negative job evaluations since February 2004. For these reasons, Christie argued he was entitled to be reinstated as a staff attorney for DEQ. For its part, DEQ introduced testimony from North and Madden concerning Christie's absences from work during times Christie claimed to have been working.

¶14    The Hearing Examiner issued his recommendation in November 2007. Although DEQ terminated Christie because it determined that Christie had filed false time records, the Hearing Examiner stated that the issue presented was "whether the time exaggerations, without more, justify Christie's immediate discharge." The Hearing Examiner observed that "Christie's log in times showed late arrival or early departure, or Christie's use of the internet coincided with late arrival or early departure, inconsistent with time records submitted by Christie." He also found that "with respect to this proceeding, it is the finding of the Hearing Examiner that Christie exaggerated his hours on at least some, if not most, of the occasions." Despite these findings, the Hearing Examiner failed to make a finding concerning whether Christie had intentionally falsified his records.

¶15    Instead, the Hearing Examiner referred to the State Discipline Handling Guide and determined that just cause did not exist for DEQ to terminate Christie because DEQ had failed to prove that Christie's work record with DEQ was deficient. The Hearing Examiner stated that "Christie should be given an opportunity to correct his deficient performance" and that DEQ did not have good cause to terminate Christie. Ultimately, the Hearing Examiner recommended that Christie be reinstated as a DEQ staff attorney.

¶16    Director Opper reviewed the Hearing Examiner's recommendation, allowed Christie and DEQ to file exceptions, and scheduled oral argument. Christie did not appear at oral argument. He did, however, file exceptions after argument. Christie objected to the oral argument on procedural grounds.

6

¶17     After reviewing the recommendation and the administrative record, Director Opper concluded that the Hearing Examiner had erred when he found that Christie had exaggerated his hours on some, if not most, occasions, but nonetheless found that there was no need to ascertain whether Christie's actions were intentional. Director Opper found that the State Discipline Handling Guide provides that theft of state or employee property, including falsification of records, are offenses that "are so serious that they warrant discharge on the first occurrence," without requiring a review of the employee's work record.

¶18     Director Opper also concluded that "[f]indings as to whether Christie intentionally falsified his time records were necessary to address the reasons expressed by the Department for the discharge." Noting that the Hearing Examiner had failed to make findings with respect to an essential issue, Director Opper reviewed the record and concluded that "Christie intentionally falsified his time records, in order to receive pay for time not worked." Director Opper also observed that because Christie was warned about filing false time records in February 2004, he could not claim that his problems represented a "first occurrence" suitable for progressive discipline. Accordingly, Director Opper concluded that DEQ had just cause to terminate Christie.

¶19     Christie filed a petition for review of Director Opper's order pursuant to § 2-4-702, MCA (2007). Christie maintained that Director Opper had substituted his judgment "as to the weight of the evidence on the question of good cause to discharge Mr. Christie and failed to properly apply the progressive discipline policy." Specifically, Christie argued that Director Opper had improperly substituted his judgment as to the

weight of the evidence in determining that Christie had intentionally falsified his time records, and that Director Opper had failed to apply the State's progressive discipline policy by ignoring Christie's prior work record.

¶20 In response, DEQ maintained that Director Opper had not substituted his judgment for that of the Hearing Examiner's on the issue of whether Christie had intentionally falsified his time records. Because the Hearing Examiner had failed to make a finding with respect to whether Christie had acted intentionally, in order to address the express basis for DEQ's discharge of Christie, Director Opper was required to make such a finding. DEQ argued that Director Opper had reviewed the entire record and made specific findings that led to his conclusion that "Christie intentionally falsified his time records, in order to receive pay for time not worked." With respect to Christie's second contention, DEQ noted that certain serious infractions warrant discharge on the first occurrence. The State Discipline Handling Guide provides that theft of state property and falsification of records constitute such serious infractions; thus, DEQ argued, the progressive discipline policy was immaterial.

¶21 Upon review, the District Court affirmed Director Opper's decision and stated that it viewed Christie's behavior as a breach of public trust, a violation of his position as a member of the DEQ legal team, a violation of the rules of ethics for state employees, and a violation of § 2-2-121(2)(a), MCA (2007), which states that a public officer may not use public time or funds for the officer or employee's private business purposes. The court noted that "it is clear that Christie exaggerated his hours worked and spent

8

substantial portions of his workweek at home," and that Christie's "behavior evidences a pattern of deception that no employer, public or private, is required to endure."

¶22 The court also stated that Christie had never provided any reasonable explanation for the hours he claimed to have worked but was not available to his employer. No witnesses ever testified on Christie's behalf. Instead, "Christie attempted to cover his tracks on one of the many days he cut hours by falsely claiming he was meeting with Pizzini." According to the court, the Hearing Examiner's determination that DEQ lacked just cause to terminate Christie without reviewing his service record was clearly erroneous "in light of the substantial evidence in the record and the State's Discipline Handling Guide which specifically provides that 'theft of state or employee property' and 'falsification of records' are infractions which 'are so serious that they warrant discharge on the first occurrence.' "

¶23 With respect to Christie's claim that he was entitled to progressive discipline based on his work record, the court noted that there was substantial evidence upon which Director Opper could determine as a matter of law that Christie's dishonesty required immediate termination. "While twenty-three hours over seven weeks may have seemed insignificant to the hearing examiner, this Court agrees with Director Opper that when taken over the course of a year, the amount is substantial—about one month's time which is more vacation time than Christie was allowed."

¶24 The District Court observed that the Hearing Examiner had failed "to appropriately weigh the level of disciplinary action which was necessary under the circumstances," and that he had ignored the State's Discipline Handling Guide, which

9

recognizes that falsification of time records justifies immediate termination so long as the employee had prior knowledge of the rules or policies prohibiting the offense. "Christie's abilities as an attorney for DEQ, no matter how good, cannot overcome the direct proof of falsification, theft, and dishonesty presented in this case, absent a showing of some sort of disability or a reasonable explanation from Christie." The court concluded that DEQ was not required to consider Christie's work record prior to terminating him for a serious infraction because state management has the authority to determine whether progressive discipline is appropriate on a case-by-case basis. Accordingly, the District Court affirmed Director Opper's December 11, 2007 Findings of Fact, Conclusions of Law, Order, and Notice of Opportunity for Judicial Review, and denied Christie's petition for judicial review. Christie appeals.

## STANDARD OF REVIEW

¶25 This Court reviews a district court's decision on judicial review of an agency decision to determine whether the findings are clearly erroneous and whether the conclusions of law are correct. *See e.g. O'Neill v. Department of Revenue*, 2002 MT 130, ¶ 10, 310 Mont. 148, 49 P.3d 43.

## DISCUSSION

¶26 *Did the District Court and Director Opper err by substituting their judgment for that of the Hearing Examiner's as to the weight of the evidence?*

¶27 On appeal, Christie reiterates the arguments he presented to the District Court. Namely, Christie maintains that Director Opper improperly substituted his judgment as to the weight of the evidence. Christie argues that DEQ "offered no evidence that Mr.

Christie intentionally falsified his time records," and that "[t]he best that can be said about the totality of evidence on the issue of intent was that it was conflicting and equivocal." He contends that under § 2-4-621(3), MCA (2007), because Director Opper did not actually hear or observe witnesses, he could not weigh inconsistent evidence and arrive at a finding contrary to that of the Hearing Examiner. In addition, Christie maintains that the Hearing Examiner "found that Mr. Christie's time keeping records were not dishonest," and thus, DEQ was required to consider Christie's work record and use a form of progressive discipline instead of termination. For these reasons, Christie contends that Director Opper and DEQ rendered a decision that was clearly erroneous.

¶28 We disagree. Although DEQ terminated Christie for submitting false records, as discussed above, the Hearing Examiner failed to make a finding on the issue of whether Christie had intentionally falsified his time records. Yet, even Christie admits that whether he intentionally falsified records was an issue central to DEQ's reasoning to terminate Christie's employment. Christie's opening brief on appeal states that "resolution of the appropriateness of the termination rose and fell on the question of honesty." Because the Hearing Examiner failed to address the basis for Christie's discharge, that task fell to Director Opper.

¶29 The District Court observed that substantial evidence existed in the record "upon which Director Opper could determine as a matter of law that Christie's dishonesty required immediate termination." We agree. The Hearing Examiner found that Christie had exaggerated his work hours on some, if not most, occasions. Christie failed to provide any reasonable explanation for the twenty-three hours he claimed to have worked

11

that DEQ determined he did not work during the seven-week monitoring period. When asked to account for his whereabouts during work hours only two days before, Christie falsely claimed he had been meeting with Pizzini. When it became apparent that North had spoken to Pizzini and learned that Pizzini had not met with Christie all day, Christie changed his story and then claimed he had gone home to nap. Substantial evidence exists in the record that Christie persistently and intentionally falsified his time records and claimed to have worked hours that he did not work.

¶30 Under Admin. R. M. 2.21.6507 (2007), "failure to satisfactorily perform job duties" constitutes just cause for termination. Just cause also includes "actual violation of an established agency standard," "failure to meet applicable professional standards," and "unprofessional or inappropriate behavior." DEQ terminated Christie for falsification of records and determined that his actions were a "manifestation of dishonesty" and a "theft of state resources." Intentional falsification of time records falls within the ambit of "just cause" as defined in Admin. R. M. 2.21.6507.

¶31 Christie's assertions that DEQ was required to consider his service record prior to termination are without merit. As set forth in the State Discipline Handling Guide, certain serious infractions do not require consideration of an employee's overall service record prior to termination. The Guide permits discharge upon the first occurrence for serious infractions such as falsification of records and theft of state property. DEQ was therefore not required to consult Christie's service record prior to termination.

¶32 Even though the Hearing Examiner concluded that Christie had "exaggerated" his work hours on numerous occasions, he stated that Christie's behavior was "not so severe

12

a breach of the public trust that discharge should be automatic." This conclusion of law—improperly characterized as a finding of fact—is in direct conflict with the State Discipline Handling Guide, which provides for termination upon first occurrence of falsification of records or theft of state property. Because this conclusion of law was incorrect, Director Opper and the District Court did not err in contravening it.

¶33 Even if DEQ was required to consider Christie's record, Christie would not necessarily be entitled to a lesser form of discipline under a progressive discipline policy. Agency managers are given discretion to determine whether progressive discipline is appropriate. *See* Admin. R. M. 2.21.6509(2) (2007) ("Management may determine the appropriateness of using progressive discipline on a case-by-case basis.").

¶34 The Hearing Examiner failed to make findings regarding whether Christie had intentionally falsified his work records. Because such falsification formed the basis for DEQ's termination of Christie, Director Opper was required to make a finding concerning Christie's intent. In so doing, Director Opper did not substitute his judgment for that of the Hearing Examiner's. The District Court concluded upon review that substantial evidence existed "upon which Director Opper could determine as a matter of law that Christie's dishonesty required immediate termination." Neither Director Opper nor the District Court erred by substituting their judgment for that of the Hearing Examiner. DEQ was not required to review Christie's service record prior to termination.

¶35 *Did the District Court err by referencing a warning letter that was not part of the administrative record?*

¶36 Christie argues that the District Court erred by making the 2004 warning letter the "crux" of its order affirming Director Opper's decision. In particular, Christie points to several passages of the District Court's order. He objects to the court's statement that "[b]ecause Christie had been disciplined in the past for the same offense, he was uniquely on notice that further time-skimming would lead to his termination from employment, and DEQ had no duty to determine whether Christie was a valuable employee before terminating that employment." Christie contends that because the letter was not part of the administrative record and should have been removed from his personnel file in 2005, the District Court's "reliance on that evidence is clearly erroneous."

¶37 Substantial evidence exists in the record to support Director Opper's finding that Christie had intentionally falsified his time records. Christie's actions constituted just cause for termination by DEQ without regard to the 2004 warning letter. Given our analysis above, we conclude that even if the District Court's references to the warning letter were in error, any such error was harmless.

<strong>CONCLUSION</strong>

¶38 The District Court and Director Opper did not err by substituting their judgment for the Hearing Examiner's as to the weight of the evidence. Moreover, DEQ was not required to consider Christie's work record prior to termination. Lastly, even if the District Court erred by referring to the 2004 warning letter, any such error was harmless.

¶39 Affirmed.

/S/ PATRICIA O. COTTER

We concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ JOHN WARNER
/S/ JAMES C. NELSON